**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MICHAEL IRONS,**<br><br>       **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

                      **CRIMINAL ACTION**
                      **NO.  20-40029-TSH**

**MEMORANDUM AND ORDER ON DEFENDANT'S**
**MOTION TO SUPPRESS SEARCH WARRANT AND**
**MOTION TO SUPPRESS STATEMENTS AND EVIDENCE**
**March 23, 2022**

**HILLMAN, D.J.**

The United States of America (the "Government") charged Michael Irons ("Defendant")

in a with distribution and possession of child pornography. Defendant moves to suppress all

evidence seized as a result of the search warrant issued, all statements made by him to law

enforcement, and all evidence obtained from electronic sources.  For the following reasons, the

motion to suppress is **denied**.

**Background[1]**

On July 5, 2019, Kik Messenger ("Kik"), a free instant messaging application for mobile

devices designed for chatting or messaging, created a report regarding the suspected transmission

of child pornography on their application. According to the report, on that same day, an online

user submitted an Abuse Report after an individual with the Kik username "Fun_boy1313" sent

three videos of suspected child pornography in a chat. The subscriber information for

---

[1] The following are facts that the Court finds based on the materials submitted in support of this motion, the audio recording of the Defendant's interview and the evidentiary hearing held on December 13, 2021.

"Fun_boy1313" included the name "M D," an email address "yomiketow@gmail.com," a phone

type as Android, and a phone model as SM-G920P.

The Abuse Report stated that "Fun_boy1313" texted to the other user, "Trade vids?" and

later texted "Y oung?" The Abuse Report also contained the three videos, two of which

Homeland Security Investigations ("HSI") Special Agent Jason DeFreitas ("DeFreitas"), a

Special Agent with HIS, believed to be child pornography, specifically:[2]

> a.      File "d014c874-3a01-4bfc-a98c-7dc75b07e017.mp4": the video is approximately 1 minute and 2 seconds in length and depicts a topless prepubescent female child, approximately 2-3 years old, performing oral sex on an adult's penis. Later in this video, the adult male ejaculates in the child's mouth; and

> b.      File "cd45c86d-622c-4f82-b895-fd009a4f3962.mp4": the video is approximately 1 minute and 5 seconds in duration and depicts two females approximately 8-10 years of age. In the video, the two children pull their pants down, exposing their buttocks and vaginas. In a segment of the video, one child grabbed her vagina with both hands. Both children are prepubescent, as indicated by their lack of breasts and pubic hair.

The Kik Report also contained an IP address associated with the "Fun_boy1313"

account, 24.63.240.155. The IP address was used to send all three videos referenced above as

well as one of the text messages referenced in the Abuse Report. In addition, the same IP address

was used to access the Kik account on several other occasions in the same month and the

preceding month of June 2019.

HSI received the Kik Report in November 2019. Subsequently, HSI conducted a query

within the American Registry for Internet Numbers online database, which revealed that IP

address 24.63.240.155 was registered to Comcast Communications ("Comcast"). On December

19, 2019, HSI sent an administrative summons to Comcast for the subscriber information

---

[2] The third video depicts a nude female performing self-masturbation. Although HSI believed the female was under the age of 18, HSI could not make that determination without further evaluation.

associated with IP address 24.63.240.155 on July 5, 2019 at 13:08:46 UTC. Comcast returned the

following subscriber information: April Cutler, 238 West Street, Gardner, Massachusetts 01440

("the Gardner Address").

A public records database search indicated that April Cutler and the Defendant resided at

the Gardner address together, and that the Defendant had been associated with the address since

2008. RMV records further revealed that on or about May 28, 2020, the Defendant and Cutler

were both issued Massachusetts drivers' licenses that listed the Gardner address as their

residence, and that the Defendant was the registered owner of a 2012 Toyota Rav4 and a 2003

Nissan Altima, both of which were linked to the Gardner address.

HSI further reviewed the Defendant's Facebook account which listed his occupation as a

manager for a towing company located in Gardner. In addition, HSI obtained information from

the U.S. Department of Labor confirming that the Defendant was employed by this same towing

company. On or about May 25, 2020, Gardner Police Detective Christopher Starynski informed

HSI that the Gardner address was owned by the Defendant's employer. On or about May 29,

2020, HSI Task Force Officer ("TFO") Randy DeMello conducted surveillance at the Gardner

Address. TFO DeMello observed the two vehicles registered to the Defendant parked at the

Gardner address along with a vehicle registered to Cutler. The Gardner address is located directly

next door to the tow company that employs the Defendant. HIS Special Agent Jason DeFreitas

drafted a search warrant for the Gardner address with all the above information. On July 28,

2020, the Court signed the search warrant.

On the morning of July 30, 2020, HSI executed the search warrant on the Gardner

Address. Approximately nine law enforcement officers, including three computer technicians,

arrived to execute the search.  At this time, the Defendant, his girlfriend's daughter Alexis

Williams, and her boyfriend, Bradley Duffy were present in the residence. During the search of the house, agents found two phones in the Defendant's bedroom.  One phone was a Samsung Galaxy S6 ("S6"); the other phone was a Samsung Galaxy S9 ("S9").

The Defendant agreed to speak to agents.  The 60-minute interview was recorded and conducted in a room off the main kitchen. HIS Agents DeFreitas and Janet Connolly conducted the interview and another local officer stood nearby.  Before the interview began, agents provided the Defendant his *Miranda* warnings and the Defendant agreed to speak to them.  The Defendant then signed the Advice of Rights form and waiver.

During the interview, which took place in an eat-in area off the kitchen, neither agent drew or displayed their weapon or handcuffs. The Defendant was not placed in handcuffs and was not physically restrained. He did not ask the agents to leave, end the interview or ask for an attorney. He did not ask the agents to slow down and when asked several times if he had any questions, he replied that he did not. The agents told Defendant multiple times that he was free to leave the interview and was offered water by Agent Connolly. The tone of the interview was collegial and calm, with some banter and joking between the agents and the Defendant.

During the interview, the Defendant confirmed that both the S6 and S9 phones belonged to him.  The Defendant further confirmed that "Fun_boy1313" was his username on Kik and admitted to trading, sharing, and distributing child pornography.  The Defendant stated that he used Kik as recently as the day before, July 29, 2020.  The Defendant further stated that he would also use Snapchat and confirmed that his username on Snapchat was also "Fun_boy1313." The Defendant stated that after meeting underage girls on the Kik application, he would continue the conversations on Snapchat.  The Defendant stated that he believed the girls were as young as 15 years of age.

In addition to the search warrant, which gave agents the authority to search the Defendant's mobile phones, agents also obtained the Defendant's verbal and written consent to search his Kik, Snapchat, and Mega applications on both the S6 and the S9 phones. At the conclusion of the search of the residence, HSI took the Defendant's two phones and no other electronic devices.

Agents subsequently completed an extraction of the Defendant's two phones.  During a preliminary search of the S6 cell phone, agents found at least 50 videos of child pornography. On the S9 phone, HSI agents found approximately 300 videos, which according to the metadata, came from the Mega application.  Of the 300 videos, agents believe that at least 150 videos constitute child pornography.  HSI further found a Kik messenger group chat on the Defendant's S9 phone under the username "funny_boy1313."  The group chat was titled "sharingiscaring." The group chat began on July 22, 2020, and contained approximately 40 people uploading images and videos of suspected child pornography.

The Defendant played an active role in the group chat.  In addition to sharing images and videos, the Defendant encouraged others to share child pornography, making comments such as, "Need to kik people out that dont share," "Daddys girl vid wont play," "Share what ya got. Younger the better," and "Anyone have that video daddys girl asks to have sex?"  The Defendant distributed a final video on July 30, 2020, at 9:27 AM UTC.

### Discussion

*Search Warrant*

The Fourth Amendment, which protects individuals against unreasonable government searches and seizures, provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. A warrant is based on probable cause when "the affidavit upon which a

warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has

been committed and that there is sound reason to believe that a particular search will turn up

evidence of it." *United States v. Aguirre*, 839 F.2d 854, 857-858 (1st Cir. 1988). Probable cause

means "reasonable cause," something significantly less exacting than "more likely than not" or

"by a preponderance of the evidence." *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir. 1979).

"The standard of probable cause is the probability, not a *prima facie* showing, of criminal

activity." *United States v. Ciampa*, 793 F.2d 19, 22 (1st Cir. 1986); *see also Safford v. Unified

Sch. Dist. of Redding*, 557 U.S. 364, 371 (2009).

Where a defendant challenges the legality of a search conducted pursuant to a search

warrant, he bears the burden of showing by a preponderance of the evidence that the search was

unlawful. *United States. v. Legault*, 323 F. Supp. 2d 217, 220 (D.Mass. 2004); *see United States

v. Burdulis*, No. 10-40003, 2011 WL 1898941, at *3 (D.Mass. May 19, 2011) (citing cases). The

issue for the reviewing court is whether "the totality of the circumstances" in the affidavit

afforded the clerk magistrate a "substantial basis for determining the existence of probable

cause" for the search. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317 (1983). A reviewing

court "must examine the affidavit in a practical, commonsense fashion" and "accord

considerable deference to a magistrate's determination that information in a particular affidavit

establishes probable cause." *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999) (internal

quotation marks and citation omitted).

The Defendant's first motion to dismiss challenges the validity of the search warrant

alleging that it is overbroad because Paragraphs B through D in Attachment B to the Affidavit

(Docket No. 74-1, p.17) does not limit the search of the computers to child pornography.

The Fourth Amendment's particularity requirement focuses on two concerns: "one is whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take, and the other is whether the category as specified is too broad in the sense that it includes items that should not be seized." *United States v. Upham,* 168 F.3d 532, 535 (1st Cir.1999) (citations omitted). A warrant authorizing seizure of a suspect's home computer equipment and digital storage media for later off-site electronic search is not overbroad or unreasonable, as long as the probable-cause showing in the warrant application demonstrates a "sufficient chance of finding some needles in the computer haystack ." *Upham,* 168 F.3d at 535. As the *Upham* court explained:

> As a practical matter, the seizure and subsequent off-premises search of the computer and all available disks was about the narrowest definable search and seizure reasonably likely to obtain the images.... [A] search of a computer and co-located disks is not inherently more intrusive than the physical search of an entire house for a weapon or drugs.... [I]f the images could be easily obtained on-site, there might have been no justification for seizing all computer equipment because it would include equipment with no connection to the crime. But it is no easy task to search a well-laden hard drive by going through all of the information it contains ....

*Id*. See also *United States v. Grimmett,* 439 F.3d 1263, 1267 (10th Cir.2006) (holding that warrant authorizing search and seizure of "any and all computer hardware, ... software," computer equipment, and computer storage devices was not overbroad).

Here, Attachment B to the search warrant affidavit contains three separate sections: (Section I) a description of the items to the seized from the Defendant's residence pursuant to the search warrant; (Section II) definitions of terminology used in the attachment, such as the definition of "computer equipment"; and (Section III) a section regarding the return of any computer equipment seized:

ATTACHMENT B

ITEMS TO BE SEIZED

I.     All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C. §§ 2252A(a)(2)(A & 2252A(a)(5)(B), including:

    A.  Records and tangible objects pertaining to the following topics:

       1.  Child pornography and child erotica; and

       2.  Communications with any other person that relates to the sexual exploitation of children.

(Docket No. 74-1, p.17). Attachment B to the affidavit clearly spells out that Paragraphs A through D fall under Section I, which limits the scope of the items that can be seized as pertaining to child pornography. Here, the language in Attachment B is narrower than the warrants upheld in *Upham*. Moreover, Attachment B is supported by statements in the affidavit setting forth that criminal activity occurred through the internet through electronic equipment. The affidavit further notes that individuals who consume child pornography often save such images in array of other electronic equipment. Consistent with the language in Attachment B, agents only seized computer equipment that constituted "evidence, fruits, or instrumentalities" of the possession and distribution of child pornography, or the Defendant's two cellular phones. The Court finds that the limitations in the warrant was specific as to the type of devices that could be seized.

The Defendant further contends that the search warrant is based on stale information because the Kik Report was dated July 5, 2019, and the search warrant was not obtained until approximately one year later, on July 28, 2020. "[A]n affidavit supporting a search warrant must contain timely information or else it will fail." *United States v. Schaefer*, 87 F.3d 562, 568 (1st

8

Cir. 1996); *see also Sgro v. United States*, 287 U.S. 206, 210-211 (1932). However, "[w]hen

evaluating a claim of staleness, [courts] do not measure the timeliness of information simply by

counting the number of days that have elapsed." *United States v. Morales-Aldahondo*, 524 F.3d

115, 119 (1st Cir. 2008). Rather, the court must "consider[ ] various factors, including 'the nature

of the information, the nature and characteristics of the suspected criminal activity, and the likely

endurance of the information' in assessing the information's ripeness." *United States v. Tiem

Trinh*, 665 F.3d 1, 13 (1st Cir. 2011), *quoting Morales-Aldahondo*, 524 F.3d at 119.

In *Morales-Aldahondo*, the Court found that a search warrant was not stale despite the

passage of three years since law enforcement acquired information that the defendant had

accessed child pornography. *Id*. The Court pointed to information provided by the government

that "customers of child pornography sites do not quickly dispose of their cache. This is not a

new revelation." *Id*., *citing United States v. Irving*, 452 F.3d 110 (2d Cir. 2006) (no staleness

after two years); *United States v. Riccardi*, 405 F.3d 852 (10th Cir. 2005) (no staleness after five

years); *United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (five year delay was not too

long because "staleness inquiry must be grounded in an understanding of both the behavior of

child pornography collectors and of modern technology").

Here, the underlying facts and the caselaw support a finding that the information

contained in the affidavit of a one-year difference between the time that of the Kik report and the

search warrant does not render the information stale and provided ample probable cause to

believe that child pornography would be found at the Defendant's residence.

Finally, the Defendant challenges the search warrant because Agent DeFreitas did not

possess the requisite training as an affiant to the search warrant and that he showed a reckless

disregard for the truth in stating he did not believe that Defendant's girlfriend's daughter,

Williams, and her boyfriend lived at the Gardner Address. Both arguments come up short. As to the former, Agent Freitas has been employed by HSI for 15 years, has done other investigations related to child pornography, ten of which involved the Kik messenger, which experience he relied on in addition to the training and expertise of other agents. *United States v. Barnes*, 506 F.3d 58, 62-63 (1st Cir. 2007). In addition, the affidavit contained the nexus element as the basis for the search warrant, that is the documented criminal activity between the Gardner Address and the Kik Report with the IP address registered to the Gardner Address. *United States v. Lindsey*, 3 F.4th 32, 39 (1st Cir. 2021), *citing United States v. Dixon*, 787 F.3d 55, 59 (1st Cir. 2015). As to the latter argument, the Court finds that the information as to Williams and her boyfriend has no bearing on the probable cause analysis.

*Statements and Evidence*

In the Defendant's second motion to suppress, he argues that his interview with HSI agents was both a custodial interrogation and involuntary.  The circumstances of the day in question lead the Court to conclude that Defendant was not in custody at the time he was questioned by Agents DeFreitas and Connolly and that his statements and cooperation were voluntary.

"Any statements obtained as a result of custodial interrogation in the absence of Miranda warnings must be suppressed." *United States v. Jackson*, 544 F.3d 351, 356 (1st Cir. 2008). The term "interrogation" refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682 (1980). "A volunteered statement is not the product of interrogation and is not subject to suppression, even if warnings have not been provided." *Jackson*, 544 F.3d at 357. A defendant

is in "custody" when the circumstances surrounding the interrogation objectively constitute the restraint on freedom associated with a formal arrest. *See United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011).

The custodial inquiry is an "objective, suspect-focused" examination that is "informed by our assessment of the reasonableness of the detaining officer['s] ... actions in response to developing conditions." *United States v. Chaney*, 647 F.3d 401, 409 (1st Cir. 2011). A finding of custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." )). *U.S. v. Cruz-Rivera*, 14 F.4th 32, 47–48 (1st Cir. 2021), *citing United States v. Melo*, 954 F.3d 334, 340 (1st Cir. 2020) (*quoting Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526 (1994) (per curiam)). For the first step, to "ascertain whether ... a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave[,]' " *Howes*, 565 U.S. at 509 (alteration in original) (*quoting Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457 (1995)), we look to a number of factors "relevant to this aspect of our custody analysis," *Melo*, 954 F.3d at 340." Id. at 48. These include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Id*. (*quoting United States v. Masse*, 816 F.2d 805, 809 (1st Cir. 1987)).

It is clear that during the interview between the Defendant and the agents, the overall mood of the meeting was calm, and the dialogue was conversational. Out of an abundance of caution, the Defendant was given his *Miranda* warnings before any interrogation began. The interview took place at his home and was completed within an hour. There were only two agents questioning the Defendant and he was not physically restrained. No threats were made to the

Defendant, and he was told several times that he could end the questioning and leave the house. Given these facts, the Court finds that the Defendant's interview with the HIS agents was not custodial.

Defendant's next claim is that the officers coerced him into a confession in violation of the Fifth Amendment's self-incrimination clause, and thus his confession and the fruits of his cooperation with the police should be suppressed.

The voluntariness of a confession and the validity of a waiver are decided "in light of the totality of the circumstances." *Procunier v. Atchley*, 400 U.S. 446, 453 (1971) (voluntariness); *North Carolina v. Butler*, 441 U.S. 369, 374-375 (1979) (waiver). Relevant factors that courts have considered include promises or other inducements, the defendant's age; education; intelligence and emotional stability; his physical and mental condition; and the details of the interrogation, including its length, intensity, and any degree of trickery or deceit on the part of the interrogators.

Assessing the voluntariness of a confession requires examining the totality of the circumstances, balancing "the officer's tactics with the unique background of each individual suspect," to determine "whether the government's conduct overtook the will of the defendant." *United States v. Hufstetler*, 782 F.3d 19, 22 (1st Cir. 2015). "Relevant considerations may include the length and nature of the questioning, any promises or threats made, and any deprivation of essentials[.]" *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011). "They also include the defendant's personal circumstances, including his age, education, intelligence, and mental condition, as well as his prior experience with the criminal justice system." *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014) (internal citation omitted).

With regard to the officers' conduct, "[o]nly confessions procured by coercive official tactics should be excluded as involuntary*." United States v. Boskic*, 545 F.3d 69, 78 (1st Cir. 2008) (internal quotation marks and alteration omitted); *see also Bryant v. Vose*, 785 F.2d 364, 368 (1st Cir. 1986) (finding a confession voluntary where it was not "the product of coercion or other improper tactics."). The more familiar or neutral the setting of the interview, the less likely it will be deemed to have a coercive overtone, as is usually the case when questioning takes place in a suspect's own home. *See Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612 (1976). The tone of the interrogation may also figure in the determination of whether the setting was custodial. *See id.* at 343, 96 S.Ct. 1612 (conversation was "friendly," "relaxed," and "[un]press[ing]"); *United States v. Leyva,* 659 F.2d 118, 120 (9th Cir.1981) (questioning was "low-key"). *Compare Orozco v. Texas,* 394 U.S. 324, 325, 89 S.Ct. 1095 (1969) (defendant was questioned while surrounded in his bed by four armed officers).

Despite his lack of experience in criminal law, here the Defendant followed the line of questioning and gave clear and responsive answers. While Defendant also argues that his need for special education services in school challenged his ability to understand the proceedings against him, he appeared to understand the content of his exchanges with the officers; the agents were not made aware of Defendant's learning disability. *See Hughes*, 640 F.3d at 438 (confession voluntary where "[t]he defendant was mature but not elderly. He had a high school education and had taken some college courses. There is no indication that he suffered from low intelligence."). The Defendant also answered all the agents' questions coherently and without difficulty. The Defendant told agents that he had a steady job as a tow truck operator and mechanic and had been living in his residence for approximately 15 years, which is owned by his

employer. These characteristics of the interview indicate that Defendant was able to understand the proceedings against him and voluntarily relinquish his rights.

*Consent to Search Form*

The Defendant's final argument is that he was coerced into signing the Consent to Search form that allowed the officers to a search the two Samsung phones found in the home on July 30, 2020. During the interview, Agent DeFreitas specifically requested permission to search the defendant's phone.  Agent DeFreitas further informed the defendant that he was "not making any promises for cooperation."  The agent then told the defendant that he would let the prosecutor know that the defendant had been cooperative, but that no "promises" or "quid pro quo" were being made.  Even with the defendant's limited experience with law enforcement, the defendant clearly understood the agents' request when he responded with, "I'm willing to work with." After making the request and before the defendant signed the form, Agent DeFreitas explained the information on the form. For the same reasons discussed *infra* with regard to voluntariness, the Court also concludes that Defendant's signing of the Consent to Search form was not coerced.

## Conclusion

For the reasons set forth above, Defendant's Motion to Suppress Search Warrant (Docket No. 66) is ***denied*** and Motion to Suppress Statement and Evidence (Docket No. 71) is ***denied***.


**SO ORDERED.**


/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
